# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Christopher Alexander Delgado | ) | 6:26-mj- 1240 |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ February 1, 2024 _____ in the county of _____ Orange _____ in the _____ Middle _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

This criminal complaint is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Steven Chandler, Special Agent, IRS-CI
*Printed name and title*

Sworn to before me over the telephone or other reliable electronic means and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: _____ 2/20/26 _____

_____
*Judge's signature*

City and state: _____ Orlando, Florida _____

HON. LESLIE HOFFMAN PRICE
*Printed name and title*

**STATE OF FLORIDA**　　　　　　　　　　**CASE NO. 6:26-mj-1240**

**COUNTY OF ORANGE**

<u>**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**</u>

I, Steven Chandler, being duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.　　　　I submit this affidavit in support of a criminal complaint against Christopher Alexander DELGADO for one count of 18 U.S.C. § 1343 (wire fraud) and one count of 18 U.S.C. § 1957 (money laundering).

2.　　　　I am a Special Agent of the Internal Revenue Service, Criminal Investigation (IRS-CI), and have been so employed since 2021. My official duties as a Special Agent with IRS-CI include conducting complex financial investigations of individuals and businesses for violations of federal law, including tax-related financial crimes, money laundering, and bank and wire fraud. Prior to my employment with IRS-CI, I was a Special Agent with the United States Secret Service. I hold a Bachelor of Science Degree in Finance from the University of Central Florida.

3.　　　　The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from law enforcement officers, reviews of documents related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and

information gained through my training and experience and the training and experience of others.

4. Because I am submitting this affidavit for the limited purpose of securing a criminal complaint, I have not included every fact that I know about this investigation, nor have I included every fact I know about the full scope of the scheme. Instead, I have set forth only those facts that I believe are necessary to establish probable cause that DELGADO has violated 18 U.S.C. § 1343 and 18 U.S.C. § 1957.

## SUMMARY

5. As set forth in more detail below, DELGADO operated GOLIATH as a Ponzi scheme whereby victims were solicited to invest[1] substantial sums of money under false and fraudulent promises of monthly returns, which were sometimes presented as guaranteed or low risk, generated through cryptocurrency "liquidity pools." Victims were induced to give money to GOLIATH through personal referrals, professional marketing materials, luxury events, charitable sponsorships, and some monthly payments of purported returns, all of which were designed to establish GOLIATH's bona

---

[1] GOLIATH's Joint Venture Agreement contained a provision that stated "[t]he Parties acknowledge and agree that this Agreement, and the Joint Venture and activities contemplated hereunder, are not an investment product, investment offering, investment advice, or a security in any way whatsoever." Regardless, many of the victims understood the money they sent to GOLIATH to be for investment purposes because they expected to receive returns on the money based on GOLIATH's marketing materials and their contracts.

2

fides with investors. Because of these false and fraudulent representations, DELGADO and his co-conspirators obtained at least $328 million from victim investors.

6. Although DELGADO and his co-conspirators represented that GOLIATH would place the funds it obtained from victim investors in cryptocurrency liquidity pools, in reality, investor funds were primarily used to pay purported returns to earlier investors, to return principal to investors who requested it, and for DELGADO's personal expenditures. Investigation showed that the vast majority of funds were not invested into liquidity pools.[2]

7. Examples of personal expenditures that DELGADO made using victim funds include:

    a. the purchase of the real property in Winter Park, Florida, in July 2025 for approximately $3.2 million;

    b. the purchase of the real property in Kissimmee, Florida, in December 2024 for approximately $1.15 million;

    c. the purchase of the real property in Windermere, Florida, in September 2025 for approximately $8.5 million; and

    d. the purchase of the real property in Sanford, Florida, in August 2024 for approximately $1.65 million.

---

[2] Blockchain analysis showed that approximately $1.5 million was sent to Uniswap, a decentralized exchange.

8.     DELGADO and his co-conspirators took various steps to hide the fraudulent scheme from the investors and to maintain their trust, including: (1) providing investors fabricated statements related to their investment that purported to show returns when there were none, (2) providing investors with bogus explanations for delayed payments and redemptions, and (3) allowing some investors to collect more money from GOLIATH than they initially invested, which allowed GOLIATH to continue operating because investors did not realize their returns were paid from other investors' money.

9.     Beginning in late 2025, when investors attempted to withdraw their principal or purported returns, GOLIATH delayed payments, provided shifting explanations, and ultimately restricted or terminated investor access to purported information about their investments.

## **RELEVANT TERMS**

10.     A "Ponzi scheme" is a form of investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. Rather than engaging in any legitimate investment activity, the fraudulent actors focus on attracting new money to make promised payments to earlier investors as well as to divert "invested" funds for personal use.

11.     "Fiat currency" is any type of government-issued currency, such as the United States dollar, that is used as legal tender by a specific nation,

4

government, or region's citizens. Fiat currency is not backed by a physical commodity, but instead by the government that issued it.

12.     "Cryptocurrencies," such as Bitcoin and USD Coin ("USDC"), are electronically sourced units of value that exist on the internet. USDC is a U.S. dollar-pegged cryptocurrency designed to maintain a value of one U.S. dollar per token. Cryptocurrencies are generated and tracked through computer software in a peer-to-peer network, rather than issued from a government or other entity. Users of cryptocurrencies send units of value to and from "addresses," which are unique strings of numbers and letters that function like a public account number. Cryptocurrency transactions are recorded on a publicly available, distributed ledger, often referred to as a "blockchain."

13.     A "blockchain" is a distributed database maintained across a network of computers. Each transaction is grouped into a "block," which is then cryptographically linked to the previous block, forming a chronological and tamper-resistant chain. Once a transaction is recorded on the blockchain, it cannot be altered or deleted without detection.

14.     Cryptocurrency ownership is controlled by cryptographic keys. A "public address" functions similarly to a bank account number and is used to receive cryptocurrency. A corresponding "private key" is required to authorize transactions and transfer cryptocurrency from one address to another. Possession of the private key allows the holder to control and move the

cryptocurrency. Private keys may be stored in various forms, including software applications, hardware devices, written records, or cloud-based storage.

15.    Cryptocurrency may be stored in digital "wallets," which can exist as applications on computers or mobile devices, online accounts hosted by cryptocurrency exchanges, or specialized physical devices known as hard wallets.

16.    A "cryptocurrency exchange," such as Coinbase, is a type of digital currency exchange where cryptocurrency can be bought, sold, and traded for fiat currency or other digital assets.

17.    Coinbase is a United States-based cryptocurrency exchange and financial technology company that operates an online platform through which individuals and entities can buy, sell, transfer, store, and manage digital assets, including cryptocurrencies such as Bitcoin and USDC. Coinbase provides hosted digital wallets, brokerage services, and trading functionality that allow users to convert fiat currency into cryptocurrency and vice versa. Coinbase accounts are typically associated with verified user identities and may be linked to bank accounts, debit cards, or other payment methods to facilitate deposits and withdrawals. The platform maintains records of account activity, including transactions, transfers, and balances.

18.    A "decentralized exchange" is a peer-to-peer marketplace that connects cryptocurrency buyers and sellers. In contrast to centralized exchanges, such as Coinbase, decentralized platforms are non-custodial, meaning a user

remains in control of their private keys when transacting on a decentralized exchange. In the absence of a central authority, decentralized exchanges employ smart contracts that self-execute under set conditions and record each transaction to the blockchain.

19.     A "smart contract" is a digital agreement stored and executed on a blockchain network. Smart contracts are programmed to perform specific actions once predefined conditions trigger them.

20.     A "liquidity pool" is a crowdsourced pool of coins or tokens that are locked in a smart contract and used to facilitate trades between those assets on a decentralized exchange. Liquidity pools enable users to buy and sell cryptocurrency on decentralized exchanges or "DeFi" platforms, such as Uniswap, without the need for centralized exchange.

21.     Liquidity pools are typically funded by individuals who deposit pairs of cryptocurrency tokens into the pool. Depositors typically receive a portion of transaction fees or other incentives generated by trading activity within the pool. Trades conducted through liquidity pools are executed automatically by smart contracts. These formulas adjust the price of assets in the pool based on supply and demand. As trade occurs, the balances of the pooled assets change, and the value of a depositor's share of the pool may increase or decrease accordingly.

22.     GOLIATH VENTURES ("GOLIATH"), formerly known as Gen-Z Venture Firm, was established in Florida in February 2019. DELGADO

served as the President and a Director of Gen-Z Venture Firm. In September 2021, Gen-Z Venture Firm changed its name to GOLIATH. DELGADO served as the President and Chief Executive Officer of GOLIATH.

23. According to information provided to potential investors, including marketing materials and GOLIATH's website, GOLIATH is "a joint venture private fund that invested in blockchain and cryptocurrency projects." GOLIATH further characterized itself as "a pioneering firm specializing in blockchain development and decentralized finance strategies" and purported to leverage "liquidity pools to facilitate passive income generation, enhance market efficiency, and provide qualified investors with access to innovative financial opportunities."

## PROBABLE CAUSE

24. This affidavit first describes the information provided to potential investors to solicit their funds, then describes the promises that GOLIATH, through DELGADO, made in contracts, and then describes how money moved through GOLIATH's bank accounts and cryptocurrency wallet. The affidavit goes on to explain how GOLIATH and DELGADO's use of investors' money differed from what was promised through marketing materials and contracts. Finally, the affidavit provides examples of two investors' experiences with GOLIATH and DELGADO. One investor lost approximately $720,000, despite promises from GOLIATH that he would get a guaranteed return and that his investment could be returned at any time. The other investor recovered his funds

and the promised interest, though he had to communicate directly with DELGADO to do so, and DELGADO pushed back against the investor's recovery of his money.

<u>Solicitation of Investor Funds, Contracts,<br/>and GOLIATH's Online Portal</u>

25.     From January 2023 through January 2026, investors were told by DELGADO and GOLIATH directors through presentations and marketing materials that their funds would move from a traditional bank account in the name of GOLIATH to Coinbase, then to an "encrypted ledger," and ultimately into liquidity pools where returns would be generated. The following is a representation of GOLIATH's investment cycle that was presented to investors through marketing materials.



26.     From January 2023 through January 2026, GOLIATH entered into "Joint Venture Agreements" with victim investors. These agreements were often signed by DELGADO on behalf of GOLIATH. In these agreements, GOLIATH would "partner" with victim investors and purport to enter a joint venture that would utilize investor funds to make deposits into liquidity pools. The Joint Venture Agreements outlined terms and conditions of the investments, including details about how GOLIATH would invest in liquidity pools and the distribution of the return on the investors' investment. The Joint Venture Agreements sometimes guaranteed monthly returns ranging from three to eight percent or guaranteed the return of an investor's principal. Investors were offered the option to withdraw their monthly return or "roll over" monthly returns, increasing their account balances. GOLIATH employed associates, known as directors, who were responsible for soliciting investors on behalf of GOLIATH. GOLIATH represented to investors that the company would generate its revenue by charging fees to investors.

27.     Investors were provided with regular account updates through their online portals reflecting consistent monthly gains. Investors could access their account through an online portal, including a mobile application.

28.     As described further herein, though, the information provided in the investment materials, the contracts, and the online portal was false and fraudulent as the investors' funds were neither used as promised nor used for any investment activity, with the possible exception of the approximately $1.5

10

million deposited in Uniswap referenced above, and were instead primarily maintained essentially as cash in GOLIATH's bank accounts and cryptocurrency wallets.

<u>GOLIATH's Bank Accounts and Coinbase Wallets</u>

29.    While in operation, GOLIATH held business bank accounts at JP Morgan Chase and Bank of America. IRS-CI Investigative Analyst Noel Martinez reviewed records from GOLIATH's JP Morgan Chase business account ending in 0305 (hereinafter "the JPMC 0305 account") and GOLIATH's Bank of America business account ending in 9136 (hereinafter "the BOA 9136 account") for the period from January 2023 through September 2025.

30.    DELGADO was the sole signatory on the JPMC 0305 account in the name of GOLIATH. DELGADO controlled the account.[3] GOLIATH directors told at least one investor that DELGADO determined how investor funds would be allocated and directed transfers from GOLIATH accounts. In addition, bank records establish that DELGADO used funds from this account for several personal expenditures, including a wire transfer of $358,890.46, on or about August 5, 2024, towards the purchase of real property in Sanford, Florida 32771, in August 2024, which is titled in his name. The fact that DELGADO

---

[3] Based on my training and experience, executive officers of large corporations usually delegate authority to associates to make certain transfers, including expenses for nominal amounts, from business bank accounts. Based on my training and experience, I would expect the signatory on a bank account to maintain oversight of the account.

used the account to fund his personal expenses supports my belief that he had ultimate control of the account.

31.     DELGADO was a co-signor on the BOA 9136 account in the name of GOLIATH. While other individuals may have had access to the account, GOLIATH directors told at least one investor that DELGADO controlled the account and that he determined how investor funds would be allocated and directed transfers from the account. In addition, DELGADO used funds from the account for several personal expenditures, including a wire transfer of $500,000, on or about July 30, 2025, towards real property in Windermere, Florida, in September 2025, which is titled in his name. As with the JP Morgan Chase account, DELGADO's use of the Bank of America account to fund his personal expenses supports my belief that he had ultimate control of the account.

32.     DELGADO was the sole signatory on GOLIATH's Coinbase wallets. GOLIATH directors told at least one investor that DELGADO determined how investor funds were allocated and directed transfers from this wallet.

33.     Funds sent to GOLIATH from investors were primarily deposited into the JPMC 0305 account or the BOA 9136 account or transferred directly to GOLIATH's wallets at Coinbase. For example:

    a.  From January 2023 through June 2025, approximately $253 million was deposited into the JPMC 0305 account.

12

b. From May 2025 through September 2025, approximately $75 million was deposited into the BOA 9136 account.

c. From January 2023 through January 2026, approximately $62 million was received by GOLIATH's wallets at Coinbase.

34. From January 2023 to September 2025, approximately $165 million was sent to GOLIATH's Coinbase wallets from the JPMC 0305 account and the BOA 9136 account.

a. From January 2023 through June 2025, approximately $123 million from the JPMC 0305 account to GOLIATH's wallets at Coinbase.

b. From May 2025 through September 2025, approximately $42 million from the BOA 9136 account to GOLIATH's wallets at Coinbase.

<u>Fraud</u>

35. DELGADO, individually and through authorized representatives, made the following false and fraudulent representations to victim investors to induce them to give money to GOLIATH purportedly for deposits into cryptocurrency liquidity pools:

a. GOLIATH's marketing materials represented to investors that their funds would be deployed into a structured and actively managed DeFi liquidity pool strategy, primarily focused on USDC pairing on Uniswap. The materials described sophisticated risk management tools—including stop-loss mechanisms, slippage monitoring, and centralized exchange hedging—and portrayed the strategy as a

13

disciplined, yield-generating liquidity pool program designed to benefit accredited investors. These representations were materially false and misleading because, despite raising approximately hundreds of millions of dollars from investors, GOLIATH deployed only about $1 million into any liquidity pool. The overwhelming majority of investor funds were not used in the liquidity pool strategy described in marketing materials, directly contradicting the core representations that investor capital would be allocated to and managed within such DeFi liquidity pools.

b. The Joint Venture Agreement ("Agreement"), which GOLIATH commonly presented to investors, falsely represented to the victim investors that their funds would be invested into cryptocurrency liquidity pools. The Agreement falsely assured the investors that the liquidity pools would run on one or more exchanges (such as Uniswap).

c. The Agreement falsely represented to the investors that any profits generated from a Venture would be distributed on a monthly basis and that the investor had the option of selecting either a monthly payout or a monthly rollover wherein the profits would be reinvested.

d. The Agreement falsely represented to the investors that an investment in a Venture would generate a monthly return on investment of three to eight percent. Returns were sometimes described as guaranteed, and some investors were told that their principal was guaranteed.

e. The Agreement falsely told investors that they could remove their money at any time.

f. DELGADO often signed these contracts on behalf of GOLIATH.

g. GOLIATH provided investors with access to an online account portal that purported to display real-time account activity, including invested principal and returns earned. While the amounts of principal invested were accurately reflected, the reported returns were materially false and misleading. In reality, little to no investor funds were deployed into the investment strategy described, and the "returns" displayed in the portal were not generated from actual trading or liquidity pool activity. Instead, the returns were artificially calculated and manipulated to match the rate of return offered to each investor, creating the false appearance of legitimate investment performance.

36. Based on analysis of bank records and blockchain for the period January 2023 through January 2026, GOLIATH invested little, if any, investor funds in cryptocurrency investments. Instead, GOLIATH used investor funds to pay phony returns to earlier investors. Despite false representations to investors, only a nominal amount of investor funds were transferred to liquidity pools. Instead, investor funds were either held in traditional bank accounts or, if they converted to cryptocurrency, were held as USDC, a cryptocurrency "stablecoin" which is pegged to the United States dollar.

37.     At the request of IRS-CI, Chainalysis Government Solutions, LLC

("CGS")[4] analyzed the flow of cryptocurrency related to GOLIATH's known

cryptocurrency wallets, including relevant documents from Coinbase exchange

and investors, through a blockchain analysis. CGS analysis confirmed that

investor funds were moved between traditional accounts or converted to USDC,

but they were not deposited into liquidity pools, with the possible exception of

the approximately $1.5 million deposited in Uniswap referenced above, or used

for other investment activity. The funds from GOLIATH's cryptocurrency

wallets were transferred to wallets held by representatives of GOLIATH and to

wallets held by investors.

38.     For example, from January 2023 through June 2025,

approximately $50 million from the JPMC 0305 account was sent to investors

purportedly as returns on investments. Although GOLIATH falsely represented

that these payments were returns on investments, they primarily were funded

with money held in the JPMC 0305 account that investors sent to GOLIATH

for investing purposes. They were not returns from any investment activity.

39.     From May 2025 through September 2025, approximately $11

million from the BOA 9136 account was sent to investors purportedly as returns

on investments. These funds primarily originated from funds held in the BOA

---

[4] CGS provides blockchain analysis and investigation software (Reactor) to government
agencies. Reactor allows investigators to trace and visualize, across multiple blockchains,
transactions linked to criminal activity.

9136 account that investors sent to GOLIATH for investing purposes and were not returns from any investment activity.

40.     Funds from investors were also used to pay for GOLIATH's corporate spending, including payments for corporate credit cards, extravagant business gatherings, Christmas parties, and luxury travel accommodations.

41.     Investors' balances and returns reflected in the GOLIATH accounts, as provided to investors through GOLIATH's online portal, were fictitious and not tied to actual investment of their money in a liquidity pool. Instead, balances were artificially manipulated to reflect promised returns, creating a false appearance of consistent profitability. For example, account overviews for GOLIATH investors reflected "Monthly Distribution Rates" and "Monthly Distribution Balances" that purported to reflect returns on investment. In reality, there were no such returns. An example of a GOLIATH account overview is pictured below; it demonstrates that the information provided to investors was simplistic and did not show any investment- or liquidity-pool-specific particulars.

| | |
|---|---|
| Current Account Balance | $122,892.84 |
| Monthly Distribution Balance | $6,144.64 |
| Total Contributions | $0.00 |
| Monthly Distribution Rate | 5.00% |
| Exec Partner | ████████████ |
| User ID | ████████████ |

## Money Laundering

42.     Coinbase accepts both ACH payments and Fedwire transfers in the United States. Coinbase partners with Plaid as a third-party intermediary to link external bank accounts for ACH transfers and partners with Cross River Bank to support Fedwire transfers of fiat currency to and from Coinbase.

43.     Cross River Bank is headquartered in Fort Lee, New Jersey. Coinbase customers are provided with a routing and account number which Cross River Bank processes on their behalf to apply funds to Coinbase account.

44.     GOLIATH's Coinbase account was linked to the JPMC 0305 account and capable of conducting both ACH (Automated Clearing House)[5]

---

[5] The ACH network is a nationwide electronic fund transfer system operated through the Federal Reserve and national clearing centers. It connects most U.S. banks and credit

and Fedwire[6] transactions. From October 2022 to February 2025, all deposits of fiat currency into GOLIATH wallets were Fedwire deposits. Based on my training and experience, both ACH transactions and Fedwire transactions involve interstate wires.

45.     Analysis of bank records showed that GOLIATH electronically transferred funds to Coinbase from the JPMC 0305 account. Specifically, on or about February 1, 2024, DELGADO, did knowingly engage in a monetary transaction by through or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is the transfer of $300,000 of U.S. currency, such property having been derived from a specified unlawful activity, that is, wire fraud. This transfer included $40,000 that Investor 1 had given to GOLIATH on February 1, 2024, with the understanding that it would be used in a liquidity pool, as will be described in more detail below. The transfer also included the money of other investors given with a similar understanding.

46.     Prior to the $300,000 transfer to Coinbase on February 1, 2024, the JPMC 0305 account had a $10.5 million balance. Because this account was funded almost exclusively with investor funds, there is probable cause to believe

---

unions, enabling the electronic, batch-processed debits and credits between financial institutions across state lanes.

[6] Fedwire is an electronic funds-transfer system operated by the 12 Federal Reserve Banks. It acts as a national, high-speed network that settles large-value, real-time payments across state lines, connecting financial institutions throughout the country.

that the entire balance in the account on February 1, 2024 constituted proceeds of the wire fraud. Further review of account records revealed that approximately $956,990 of investor funds were deposited via wire transfers between January 31, 2024, and February 1, 2024, and no withdrawals were made prior to the $300,000 transfer. Therefore, using the last-in, first-out ("LIFO") accounting principle, the entire $300,000 transfer to Coinbase was funded with wire fraud proceeds.

Investor 1

47.     As part of the investigation into GOLIATH, IRS-CI Special Agent Richard Smith interviewed Investor 1, a resident of Seminole County, Florida. Investor 1 demonstrates how GOLIATH solicited investors and made false promises to them about how their money would be used; ultimately, Investor 1 lost approximately $720,000.

48.     Investor 1 told SA Smith that he was introduced to GOLIATH through an acquaintance, who stated to Investor 1 that he had invested approximately $1,000,000 with GOLIATH and was receiving consistent monthly returns. The acquaintance introduced Investor 1 to a representative of GOLIATH. During an in-person meeting in Seminole County, Florida, the GOLIATH representative and the acquaintance presented to Investor 1 an investment opportunity described as participation in cryptocurrency liquidity pools with guaranteed monthly returns of seven percent.

20

49.     Investor 1 was instructed to establish a Coinbase account to receive payouts. In March 2023, he initially invested $10,000 and received a first-month payout of approximately $700, representing a seven percent monthly return. The initial payment and subsequent payments were timely and consistent, which reinforced Investor 1's belief that the investment was legitimate and low risk.

50.     GOLIATH's agreement with Investor 1 was memorialized in a "Joint Venture Agreement" on June 23, 2023. DELGADO signed the agreement on behalf on GOLIATH. The agreement falsely represented that the funds would be invested in liquidity pools:

**3. JOINT VENTURE**

3.1. In executing this Agreement, the Parties have agreed to enter a joint venture for the purpose of carrying out the particular project of utilizing their cryptocurrencies by making Contributions into liquidity pools which shall run on one or more exchanges (such as Uniswap) and shall involve the pairing of a combination of cryptocurrencies to exchanges wherein, in lieu of interest, an exchange pays exchange fees for the use of the pairing to create liquidity. Each liquidity pool that the Parties collectively decide to contribute to shall be considered a **"Venture"**.

51.     The agreement also set forth the so-called "Distribution of Profits" and guaranteed a return of seven percent monthly:

**6. DISTRIBUTION OF PROFITS**

6.1. From any profits that are made, the distribution of profits will be as follows:

6.1.1. The Partner shall be entitled to monthly profits generated by its Contributions, ("**Profit(s)**"):

6.1.1.1. **For Ethereum, Bitcoin, and USDC:** profit margins will deliver 7% monthly, paid in USDC.

52.     In December 2023, Investor 1 attended a GOLIATH-hosted investor event at the Four Seasons Resort in Orlando, Florida. Investor 1 described the event as extravagant and professionally organized, with numerous

attendees, which further reinforced his belief that GOLIATH was a legitimate, well-capitalized enterprise.

53.     In May 2024, Investor 1 became involved with a charitable organization and learned that GOLIATH was a major sponsor. Through this involvement, Investor 1 met DELGADO, whose public association with charities and community events further induced Investor 1 to trust the legitimacy of GOLIATH.

54.     Based on the representations about the cryptocurrency liquidity pool investment made by the GOLIATH representative and the acquaintance and the consistency of the early payouts, Investor 1 continued investing additional funds and reinvesting purported returns. Between mid-2023 and late 2024, Investor 1 invested approximately $720,000. Of this amount, approximately $420,000 was transmitted via domestic wire transfers from Investor 1's personal bank account, and approximately $300,000 was transmitted via cryptocurrency transfers from Investor 1's Coinbase account to wallet addresses provided by GOLIATH. Specifically, on or about the following dates, DELGADO, for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly, and with intent to defraud, cause Investor 1 to transmit by means of wire in interstate commerce, the following funds:

  a.  $40,000 on February 1, 2024;

     b.  $110,000 on March 26, 2025.

55.    In late 2025, GOLIATH began delaying payments to the victim investors and attributed the delays to audits, banking issues, and compliance matters. Despite repeated assurances made by GOLIATH that payments would resume, the explanations changed over time, and no supporting documentation was provided. Investor 1 was advised that payments would resume on or about December 18, 2025, however, no additional payments were ever made.

56.    In early January 2026, Investor 1 requested an exit from the "Joint Venture" with GOLIATH and requested a return of $862,000 in principal and accrued returns. On January 9, 2026, GOLIATH represented that his funds would be returned:



This thread is correct. We have your exit pending signature and between our pending pay (October and November) we have a total of $862,800 going back to you.

$42,000 for October
$50,400 for November
$720,000 exit for December and the earned distribution of $50,400.

Best,

**GOLIATH** VENTURES



goliathventuresinc.com

57.     After Investor 1 contacted his bank to request wire reversals[7] and filed a police report with the Seminole County Sheriff's Office, GOLIATH was contacted by Bank of America regarding the reversal. Shortly thereafter, Investor 1 received a hostile text message from the GOLIATH representative, stating, "What are you doing man? You recalled funds from Bank of America from May?", demonstrating awareness of the bank inquiry and an attempt to challenge Investor 1's efforts to recover his funds. Investor 1's attempts to recover the funds have been unsuccessful.

58.     At the time of the interview with law enforcement on January 22, 2026, Investor 1 stated that GOLIATH had stopped responding to his communications and blocked his access to the GOLIATH investor application. To date, GOLIATH has not returned funds to Investor 1, and he has lost approximately $720,000.

<u>Investor 2</u>

59.     As part of the investigation into GOLIATH, IRS-CI SA Richard Smith interviewed Investor 2, a resident of Orange County, Florida. Investor 2 demonstrates the nature of GOLIATH as a Ponzi scheme because he received his money back, plus the returns he was promised, despite GOLIATH not using his money as promised. Further, Investor 2's experience shows DELGADO's

---

[7] A wire reversal is a process where the bank that receives a wire transfer returns the funds to the sender's bank. This usually occurs when the receiving bank does not accept the incoming funds. Typically, wires cannot be reversed after the receiving bank has accepted the incoming funds.

personal involvement with GOLIATH investors, including pressuring Investor 2 to leave his funds with GOLIATH.

60.    Investor 2 was referred to GOLIATH by a representative of GOLIATH, who told Investor 2 about the representative's own investment with GOLIATH and about how the monthly returns he received were very good. The representative also stated that Investor 2 could request his principal investment back from GOLIATH at any time.

61.    Prior to investing in GOLIATH, in July 2024, Investor 2 met with the GOLIATH representative and DELGADO at a restaurant located in Orlando, Florida. During the dinner, DELGADO told Investor 2 about the investment opportunity with GOLIATH. The investment purportedly utilized liquidity pools and involved money markets and the buying and selling of stock pertaining to cryptocurrency.

62.    In August 2024, Investor 2 invested $1 million with GOLIATH. The monthly rate of return was five percent, per Investor 2's contract.

63.    In November 2024, Investor 2 spoke to the GOLIATH representative and DELGADO about opportunities involving cryptocurrency. Investor 2 invested an additional $15 million with GOLIATH in December 2024. The terms of the contract regarding Investor 2's additional investment stated there would be a seven percent monthly return for six months and then a seven and a half percent monthly return for the next six months.

64.     In December 2024, Investor 2 attended a Christmas party hosted by GOLIATH. During the party, DELGADO made an announcement to the attendees that GOLIATH had secured insurance and a fidelity investment bond that would cover the principal investments made by investors.

65.     After DELGADO made the announcement about the insurance and the fidelity bond at the 2024 Christmas party, Investor 2 asked to view documentation pertaining to the insurance and the bond. DELGADO declined Investor 2's request for the documentation because of potential disclosure of personal information. DELGADO's refusal caused Investor 2 to become uneasy about his investment with GOLIATH. After DELGADO declined Investor 2's request to view the documentation, Investor 2 requested the return of his principal investment.

66.     After Investor 2 requested his principal investment back from GOLIATH, DELGADO sent Investor 2 an email detailing that DELGADO was not pleased with Investor 2's request for the return of his principal investment. On January 24, 2025, DELGADO emailed Investor 2 stating:

> I received your request for a full return of your partnership funds with GOLIATH. There are two quick points I would like to address before proceeding.
>
> #1 - Per our agreement, the percentage honored on GOLIATH'S part was solely based on maintaining an account over $10M USD (addendum attached)
>
> #2 - Per our conversation, I only allowed such increase in percentage because of the time frame in which you had agreed to have in GOLIATH.

From the viewpoint of the company, you are taking advantage of the opportunity we have allowed you to be a part of. Secondly, you are not honoring our conversation nor our agreement. At the end of the day, you are completely entitled to your funds, but you are NOT entitled to engage and re-engage with GOLIATH at your discretion. That is completely up to the company.

We will start to reconvert your funds on Monday back to USD from USDC per your request BUT you will forfeit the January distribution since our agreement and our personal conversation was broken. Secondly, if you wish to re-engage with GOLIATH, it will be at the SOLE discretion of me and will be at a rate of 1% per month with zero increase based on account value.

I will give you til Sunday to decide if you should liquidate your whole account and if I do not hear from you, we will terminate your agreement and start to wire back your funds next week.

67.     In February 2025, GOLIATH sent Investor 2 a total of

approximately $7.1 million; it sent an additional $10.6 million in March 2025.

These funds represented the return of Investor 2's principal investment and

returns on investment from the company.

## CONCLUSION

68.   Based on the foregoing, I submit that probable cause exists that

DELGADO did knowingly and willfully engage in wire fraud and money

laundering, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1957.

_____
Steven Chandler
Special Agent
Internal Revenue Service

Affidavit submitted electronically and attested to me
as true and accurate by videoconference consistent
with Fed. R. Crim. P. 4.1 and 41(d)(3)
before me this  20th day of February, 2026.

HON. LESLIE HOFFMAN PRICE
United States Magistrate Judge

28